UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUTONIA JOHNSON,

     Plaintiff,                      Case No. 2:20-cv-12283

                                        District Judge Mark A. Goldsmith

v.                             Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.     Introduction

This is a Social Security case. Plaintiff Lutonia Johnson ("Johnson") brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). Both parties have filed summary judgment motions (ECF Nos. 16, 17), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, it is RECOMMENDED that Johnson's motion (ECF No. 16) be GRANTED[1] and the matter REMANDED for further proceedings, and that Commissioner's motion (ECF No. 17) be DENIED.

## II.     Background

### A.     Procedural History

Johnson, born June 21, 1967, was 47 at the time of the March 12, 2015 alleged onset date.  (ECF No. 12, PageID.252).  She attended four or more years of college and worked previously as a school lunch aide, teacher, and automatic technician.  (*Id*., PageID.282).  She alleges disability due to bilateral macular degeneration, glaucoma, degeneration of the retina, presbyopia, vitreous disorder of the eye, herniated lumbar spine discs, osteoarthritis, varicose veins, obesity, and hypertension.  (*Id.*, PageID.281).

After Johnson's DIB application was denied at the initial level on October 6, 2017, she timely requested an administrative hearing, held July 11, 2019, before Administrative Law Judge ("ALJ") Martha Gasparovich.  (*Id*., PageID.80, 148).  Johnson, represented by attorney Randall Phillips, testified, as did a Vocational Expert ("VE").  (*Id*., PageID.86-112, 112-127).

Johnson offered the following testimony:

---

[1] Johnson seeks summary judgment in the form of a remand for further proceedings, not an award of benefits.

She lived in Farmington Hill, Michigan. (*Id.*, PageID.87). She held a Master's degree in education. (*Id.*, PageID.87). She was disabled as a result of osteoarthritis "at over 80 percent" of her body. (*Id.*, PageID.93). She experienced sleep disturbances due to body pain. (*Id.*). She had received numerous steroid injections including cervical spine injections for the condition. (*Id.*). The worst pain was in her shoulders and hands. (*Id.*). She experienced hand and foot numbness. (*Id.*, PageID.93-94). Repetitive activity such as washing dishes caused hand numbness and standing for more than five minutes caused foot numbness. (*Id.*, PageID.94). Air conditioning exacerbated the symptoms of osteoarthritis. (*Id.*). The osteoarthritis had started in her hands and later extended to her knees and hip. (*Id.*). Neither numerous rounds of physical therapy nor injections improved the condition. (*Id.*, PageID.94-95). Walking for exercise worsened the hip condition. (*Id.*, PageID.94). She was unable to meet the $8,000 copay required for surgery. (*Id.*).

Johnson was unable to read with her left eye. (*Id.*, PageID.95). She had undergone a macular hole repair of the left eye. (*Id.*). The left eye limitations caused difficulties reading with her right eye. (*Id.*, PageID.96). She was prone to falling because her lack of peripheral vision prevented her from seeing curbs. (*Id.*, PageID.104).

She underwent a left shoulder injection two weeks before the hearing. Injections no longer eased her shoulder pain. (*Id.*, PageID.97). She had been told that she required a right shoulder replacement and possible surgery for the left shoulder. (*Id.*, PageID.97, 100-102). Toradol was effective in reducing her shoulder pain but "mess[ed] with [her] head," rendering her bedbound. (*Id.*, PageID.98, 102). She was unable to sit for more than 10 minutes or stand more than five due to foot numbness. (*Id.*, PageID.99). She was limited to walking short distances due to hip pain. (*Id.*). She obtained relief by using an "arthritis pool" at a local gym. (*Id.*, PageID.100). She did not use a four-pronged cane given to her by her doctor because leaning on the cane put pressure on her shoulders. (*Id.*, PageID.101). She was limited to lifting cup-sized weights due to hand numbness. (*Id.*, PageID.103). Dietary changes did not relieve the arthritis. (*Id.*, PageID.104).

Johnson limited her driving to "two blocks" in her neighborhood. (*Id.*, PageID.105). She avoided intersections with traffic signals and never drove at night. (*Id.*, PageID.105). She did not perform any household chores due to spinal stenosis and shoulder, hip, and knee pain. (*Id.*).

In response to questioning by her attorney, Johnson reported that she was unable to walk more than a few feet without support. (*Id.*, PageID.106). She was unable to see small objects and was unable to read small print due to blurred

vision.  (*Id.*, PageID.107-108).  She reported that she was able to lift three or four

pounds but would be unable lift or grasp objects of that weight on a repetitive

basis.  (*Id.*, PageID.108-109).  Her attempts to sell life insurance policies ended

when she became incapacitated due to pain at a prospective client's house.  (*Id.*,

PageID.111).  Due to an unrelated medical condition, she experienced the need to

urinate at least once every 90 minutes.  (*Id.*, PageID.111).

B.     Medical Evidence

1.     The Eye Conditions

In July 2015, ophthalmologist Hua Gao, M.D. diagnosed Johnson with

"severe myopia," with bilateral atrophy and scarring.  (*Id.*, PageID.439).  March

2016 records also show bilateral glaucoma.  (*Id.*, PageID.445).  The following

month, Dr. Gao performed laser surgery of the left eye.  (*Id.*, PageID.404).  July

2016 follow up records note better vision of the left eye with degenerative changes

of the right eye including a "large lattice degeneration" of the right eye.[2]  (*Id.*,

PageID.544).  In August 2017, Bernard Miller, O.D.  noted "significant field loss"

---

[2] Lattice degeneration is a common peripheral retinal degeneration that is
characterized by localized retinal thinning, overlying vitreous liquefaction, and
marginal vitreoretinal adhesion.  The condition is associated with atrophic retinal
holes, retinal tears, and retinal detachments.  https://eyewiki.aao.org/
Lattice_Degeneration.  (Last visited January 18, 2022).  "[S]ymptoms may include
photopsias, floaters, peripheral visual field loss, and/or loss of vision."  *Id.*

bilaterally.[3]  (*Id.*, PageID.595).  He found that "with proper accommodations, Mrs. Johnson could possibly return to the workforce."  (*Id.*).  The following month, consultative examiner Leonidas Rojas, M.D. observed corrected vision of 20/50 on the right and 2/70 on the left.  (*Id.*, PageID.600).  In October 2017, Natalie Gray, M.D. performed a non-examining review of the medical evidence on behalf of the SSA, noting the diagnoses of glaucoma with "age related macular degeneration," but nonetheless found that Johnson would be able to "work [with] large and small objects" with a preclusion on commercial driving and "[left] to [right] assembly work."  (*Id.*, PageID.139).

In January and February 2018, Johnson underwent cataract surgery to the left and right eyes respectively.  (*Id.*, PageID.712, 719).  Johnson also underwent left eye surgery for macular degeneration.  (*Id.*, PageID.811).  Dr. Gao opined that Johnson's left eye vision would improve two to three months after surgery.  (*Id.*, PageID.812).

---

[3] A visual field defect is "a blind spot . . . or blind area within the normal field of one or both eyes" that can be caused by glaucoma and retinal disease. https://www.britannica.com/science/visual-field-defect.  (Last visited January 17, 2022).

2.      The Physical Conditions

In May 2017, Johnson reported right shoulder pain with numbness.  (*Id.*, PageID.662).  Amardeep Mann, M.D. noted that range of motion studies were performed with pain.  (*Id.*, PageID.664).  Preliminary imaging studies were consistent with rotator cuff tendinopathy.  (*Id.*, PageID.676).  Right elbow studies were consistent with tendinosis with osteoarthritis.  (*Id.*, PageID.581).  July 2017 imaging studies were consistent with right rotator cuff tendinopathy and osteoarthritis.  (*Id.*, PageID.578).  In September 2017 consultative examiner Dr. Rojas noted reduced grip strength on the right.  (*Id.*, PageID.601, 603).  He found the presence of cervical and lumbosacral degenerative disc disease, and mild osteoarthritis of the knees, hands and hip.  (*Id.*).  Johnson exhibited a "somewhat guarded" gait.  (*Id.*).  Dr. Rojas found that Johnson's work abilities was "mild to moderately impaired" as it pertained to "strenuous" occupations.  (*Id.*).  He noted that Johnson's ability to push was limited by back and neck problems.  (*Id.*, PageID.602).

Dr. Gray's October 2017 assessment includes a finding that Johnson could lift/carry 20 pounds occasionally and 10 frequently with limitations in pushing/pulling in the upper right extremity.  (*Id.*, PageID.137).  Dr. Gray found that the manipulative limitations were restricted to no more than occasional overhead reaching in the right upper extremity.  (*Id.*, PageID.138).

7

November 2017 records by sports medicine specialist Christopher Guyer,
M.D. note that right shoulder injections did not significantly reduce Johnson's
pain.  (*Id.*, PageID.699).  Johnson exhibited a reduced range of right shoulder
motion.  (*Id.*, PageID.703).  August 2018 records by Joseph Hanna, M.D. and N.P.
Holly Dodt show a decreased range of cervical spine motion and clinical signs of
lower extremity radiculopathy.  (*Id.*, PageID.640, 744).   December 2018 records
by pain management specialist Shad Siddiqi, D.O. state that treatment including
multiple steroid injections, over-the-counter pain relievers, muscle relaxants, and
therapy administered for the past three months had not improved Johnson's
condition.  (*Id.*, PageID.830).

In January 2019, Dr. Hanna opined that Johnson was unable to sit, stand, or
walk for more than one hour in an eight-hour workday or lift more than five
pounds, and that she required leg elevation.  (*Id.*, PageID. 786-788).  He precluded
repetitive pushing and pulling in the upper extremities.  (*Id.*, PageID.787).  He
found that Johnson was unable to perform light work.[4]  (*Id.*, PageID.792).  The
same month, Dr. Guyer opined that Johnson was unable to sit, stand, or walk for

---

[4] 20 C.F.R. § 404.1567(b) defines exertionally light work as "lifting no more
than 20 pounds at a time with frequent lifting or carrying of objects weighing up to
10 pounds." *See* SSR 83-10, 1983 WL 31251, at *6 (1983) ("full range
of light work requires standing or walking, off and on, for a total of
approximately 6 hours of an 8-hour workday").

more than two hours in an eight-hour workday and was unable to lift more than five pounds. (*Id.*, PageID.801-802). He also found that Johnson was unable to perform light work. (*Id.*, PageID.800). April and June 2019 imaging studies of the right shoulder showed osteoarthrosis and rotator cuff tendinopathy with cystic changes. (*Id.*, PageID.873, 879). An MRI of the left shoulder in April 2019, showed moderate tendinosis with moderate osteoarthosis. (*Id.*, PageID. 871). In June 2019, orthopedic surgeon Eric Makhni, M.D. noted the presence of "end-stage right shoulder arthritis," opining that Johnson required a shoulder replacement. (*Id.*, PageID.876). He noted the possible presence of a tear of the left shoulder during the administrative of a steroid injection. (*Id.*).

III.     Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); 20 C.F.R. § 404.1520.  "The burden of proof is on the claimant throughout the first four steps. . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Johnson was not disabled under the Act.  At Step One, the ALJ found that Johnson had not

engaged in substantial gainful activity since the alleged onset date of March 12, 2015 thorough the date of the September 3, 2019 decision.  (ECF No. 9, PageID.46).  At Step Two, the ALJ found that she had the severe impairments of "lumbar spondylosis; lumbar radiculopathy; osteoarthritis right shoulder; spinal stenosis; hypertension; obesity; and osteoarthritis of the bilateral hips."  (*Id.*).  The ALJ found that the conditions of "bilateral glaucoma, macular degeneration, severe large bilateral lattice retinal degeneration with chorioretinal scar, and posterior vitreous separation, left eye" were non-severe.  (*Id.*, PageID.46-47).  She also found the conditions of osteoarthritis of the knees and left shoulder impairment non-severe.  (*Id.*, PageID.47).  At Step Three, the ALJ found that Johnson's impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment.  (*Id.*).

The ALJ then assessed Johnson's residual functional capacity ("RFC"), concluding that she was capable of performing light work with the following additional limitations:

> [S]he is limited to standing and walking no more than 6 hours of 8; could sit up to 6 hours of 8; could lift up to 20 pounds occasionally and 10 pounds frequently; could push or pull frequently; overhead reaching with the right upper extremity is limited to occasionally; reaching in all other directions with the right upper extremity is limited to frequently; can never climb ropes, ladders or scaffolds; needs to avoid unprotected heights or open moving machinery; should not require use of depth perception.

(*Id.*, PageID.48).

At Step Four, the ALJ found that Johnson was unable to perform any past

relevant work.  (*Id.*, PageID.52).  Citing the VE's testimony, the ALJ found at Step

Five that Johnson could perform the light, unskilled jobs hand packager,

cleaner/housekeeper, and tester.  (*Id.*, PageID.53).  As a result, the ALJ concluded

that Johnson was not disabled under the Act.  (*Id.*).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although the court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec'y. of*

*Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited

one.  Judicial review is constrained to deciding whether the ALJ applied the proper

legal standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017)(same).

An ALJ's factual findings must be supported by "substantial evidence." 42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.   It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.* 582 F.3d 647, 651 (6th Circuit 2009) (internal quotations omitted).

V.    Analysis

Johnson makes three arguments in seeking a remand.  First, she argues that the ALJ erred by finding her visual impairments non-severe.  (ECF No. 16, PageID.897).  The Commissioner contends that the ALJ's finding that the visual impairments were non-severe was well explained and articulated.  (ECF No. 17, PageID.916).  Second, she argues second that the RFC does not reflect her full degree of visual limitation resulting from glaucoma, macular degeneration, and other degenerative conditions.  (ECF No 16, PageID.903).   The Commissioner argues that substantial evidence supports the finding that Johnson's visual limitations were adequately addressed by the preclusion on work requiring the use of depth perception.  (ECF No. 17, PageID.926).  Third, she argues that the RFC for exertionally light work stands at odds with the clinical evidence, imaging

studies, the treating source opinions, and her own allegations of limitation.  (ECF No. 16, PageID.905).  The Commissioner argues that the RFC is supported by numerous treating observations and Johnson's lack of aggressive treatment.  (ECF No. 17, PageID.929).

Because Johnson's first two arguments pertain to the effect of visual limitations on her work-related abilities, they can be considered together.  Her arguments regarding the physical limitations will be addressed separately.

### A.    The Visual Limitations

At Step Two, the ALJ provided a lengthy rationale for finding that Johnson's vision problems were not severe:

> The claimant has history of vision problems, including bilateral glaucoma, macular degeneration, severe large bilateral lattice retinal degeneration with chorioretinal scar, and posterior viterous separation, left eye.  She had surgery for viterous hemorrhage in July 2016.  Post-operatively, the claimant was noted to be doing well, without any significant vision problems.    An ophthalmology consultative examination in August 2017 [notes] some reduced visual acuity and field loss in both eyes, however, greater than 20 degrees.  The examiner noted the claimant would need some accommodation, but could return to the workforce.  This assessment is somewhat persuasive as the issue of ability to work is reserved to the commissioner, however, the indication that the claimant's field loss is not significant enough to prelude work activities is consistent with the objective findings and the claimant's treatment records post July 2016 surgery noting improved vision.  In February 2019, the claimant developed macular hole and underwent repair.  The claimant was noted to be doing very well in March 2019 and had no further treatment for this condition or any additional vision complaints.  Accordingly, aside from some limited field loss, the claimant has no significant vision impairment that would more than minimally affect her ability to sustain work activities.

(ECF No. 12, PageID.47).  The ALJ added that although she found the visual

impairment to be non-severe, the RFC precluded work requiring the "use of depth

perception."  (*Id.*, PageID.47-48).

By itself, the failure to include the visual limitations among the "severe

impairments" at Step Two does not constitute reversible error.  The failure to

acknowledge an impairment at Step Two is harmless error provided that limitations

stemming from the condition are addressed at the remaining steps of the sequential

analysis.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.

1987); *Fisk v. Astrue*, 253 F. App'x 580, 583-584, 2007 WL 3325869, *4 (6th Cir.

2007).  Although the visual limitations were found to be non-severe, they were

purportedly acknowledged in the RFC precluding work requiring depth perception.

(ECF No. 12, PageID.48)

However, by any measure, the restriction to work not requiring the use of

depth perception does not account for Johnson's full degree of visual limitation.

While the preclusion on depth perception work arguably addresses Johnson's

inability to see with the more severely affected left eye, the ophthalmological

records consistently show vision limitations in *both* eyes.

The records show that Johnson experienced chronic, ongoing vision

problems from at least July 2015 to the first two months of 2019.  July 2015

records note the condition of "severe myopia," with bilateral atrophy and scarring.

(ECF No. 12, PageID.439).  Contrary to the Commissioner's argument that the finding of severe myopia "does not appear to be a diagnosis, but rather part of the history section of the report" (ECF No. 17, PageID.921), Dr. Gao described Johnson as "a 47-year-old patient with severe myopia" not an individual with merely a *history* of the condition.  (ECF No. 12, PageID.439).  The same records also note "a large pigmented lattice degeneration" in both eyes.  (ECF No. 12, PageID.439).  To be sure, in July 2016, Johnson reported that she could "see better with her left eye" following laser surgery.  (*Id*., PageID.544).  However, the same records show that Dr. Gao observed "a large lattice degeneration" of the right eye. (*Id*., PageID.544).  While the ALJ relied on Dr. Gao's July 2016 statement that Johnson was "doing well," the records more than "depth perception" problems. (*Id*., PageID.47).  Dr. Miller's August 2017 statement that Johnson (whom he described as "partially sighted") experienced "significant field loss" bilaterally and required "proper accommodations" to "possibly return to the workforce" stands directly at odds with the ALJ's finding that the vision problems were limited to depth perception.  (*Id*., PageID.595).  *See* n. 2., *above.*  Dr. Miller's finding of bilateral field losses indicates that aside from the loss of depth perception, Johnson also experienced significantly limited vision.  *See Kane v. Comm'r of Soc. Sec.*, No. 6:17-CV-176-ORL-DCI, 2018 WL 3219373, at *2 (M.D. Fla. July 2, 2018) (Remand warranted where despite accord of "great weight" to a finding of visual

field defect," ALJ "inexplicably found" that the visual limitation were not severe.

"[F]ield of vision" along with "depth perception" and "accommodation" "are

factors that the Dictionary of Occupational Titles uses to describe the physical

demands of an occupation") (citing U.S. Department of Labor, *Selected*

*Characteristics of Occupations Defined in the Revised Dictionary of Occupational*

*Titles* (1993), Appendix C).  Likewise here, because the record shows visual field

defects, the ALJ erred by declining to find that the vision problems caused

significant work-related impairment or were merely limited to depth perception

problems.

The ALJ's stated rationale for finding the eye conditions non-severe is also

problematic.  While Dr. Miller found in August 2017 that "[w]ith proper

accommodations, [Johnson] could *possibly* return to the workforce," the ALJ

misquoted Dr. Miller, stating that he found that Johnson "*could* return to the

workforce" with accommodations.  (ECF No. 12, PageID.47) (emphasis added).

Moreover, Dr. Miller's statement that the visual limitations might not be work-

preclusive cannot be extended to state that they did not create more than minimal

work-related limitation.  The ALJ acknowledged Dr. Miller's finding of "reduced

visual acuity and field loss in both eyes" but it is unclear how precluding work

requiring depth perception, with nothing more, addressed the vision impediments

in both eyes due to loss of field vision. (*Id*., PageID.47); *See Kane, supra* at *2;  n.

2, *above.*  Dr. Miller's finding of reduced visual acuity is particularly critical given the VE's testimony that the inability to perform jobs requiring "prolonged visual vigilance" would eliminate two of the three jobs (hand packager and tester) forming the basis of the ALJ's Step Five determination.  (*Id.*, PageID.119-120). While the ALJ found Dr. Gray's non-examining finding that Johnson could perform light work "persuasive," she did not address or adopt Dr. Gray's additional finding that Johnson should "avoid [left] to [right] assembly work" due to vision restrictions.  (*Id.*, PageID.139).

Finally, while the ALJ noted that Johnson appeared to obtain good results from January and February 2019 cataract surgery, the records show that Johnson experienced significant and chronic visual limitations up until that time.  While substantial evidence could support the finding that the eye problems resolved after the 2019 surgeries, the ALJ's failure to consider whether the visual problems caused work-related limitation (other than a lack of depth perception) for a period of 12-months or longer prior to those surgeries warrants a remand for further inquiry.   "In determining whether [a claimant] is entitled to disability benefits, it is also necessary to consider every [12-month] period during which Plaintiff may have been disabled."  *Pena v. Barnhart*, No. 01 Civ. 502 (BSJDF), 2002 WL 31487903, *11 (S.D.N.Y. October 29, 2002); 42 U.S.C. §§ 1382c(a)(3)(A), 423(d)(1)(A). " [I]n a closed period case, the [ALJ] determines

that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision....' " *Lozada-Rivera v. Comm'r Soc. Sec.*, No. 13-14663, 2015 WL 400908, at *3 (E.D. Mich. January 28, 2015) (Tarnow, J.) (*see also Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002)).

## B.    The Physical Limitations

Johnson turned 50 on June 21, 2017.  (ECF No. 12, PageID.252).  An RFC for sedentary work for an individual between the ages of 50 to 54 ("closely approaching advanced age") and unable to perform any of her past relevant work directs a finding of disability under the Medical–Vocational Grids ("Grids"). 20 C.F.R. part 404, subpart P, App. 2, Rule 201.14.  Thus, to establish disability on or after Johnson's 50th birthday, she would not be required to show that she was disabled from all work, but rather, that she was unable to perform any of her former jobs and was limited to sedentary work.

The well-documented right extremity limitations, with nothing more, undermine the ALJ's finding that Johnson was capable of light work limited only by a restriction to occasional overhead reaching with the right upper extremity. (*Id.*., PageID.48).  May 2017 records show that Johnson experienced right shoulder pain performing range of motion studies and reported that she took Motrin 800. (*Id.*., PageID.662).  Imaging studies show osteoarthritis and rotator cuff

tendinopathy of the right shoulder.  (*Id.*, PageID.676).  Right elbow studies showed tendinosis with osteoarthritis.  (*Id.*, PageID.581).  Imaging studies from July 2017 showed AC joint osteoarthrosis and rotator cuff tendinopathy.  (*Id.*, PageID.578).

In October 2017, Dr. Gray performed a non-examining review of the treating and consultative records up until that point, concluding that Johnson could perform exertionally light work with a restriction to occasional overhead reaching with the right upper extremity.  (*Id.*, PageID.137-138).  Although Dr. Gray reviewed at most only five months of records documenting the shoulder conditions, the ALJ found these findings persuasive and incorporated them into the RFC.  (*Id.*, PageID.48-51).

However, the records post-dating Dr. Gray's assessment show that the right upper extremity problems persisted and worsened.  October 2017 clinical testing showed neurological abnormalities of the wrist.  (*Id.*, PageID.50).  November 2017 records state that injections did not reduce Johnson's pain.  (*Id.*, PageID.699).  She exhibited a reduced range of right shoulder motion.  (*Id.*, PageID.703).

The 2018 records show that steroid injections, muscle relaxants, and therapy had not improved Johnson's condition.  (*Id.*, PageID.830).  April and June 2019 imaging studies showed both osteoarthrosis and rotator cuff tendinopathy with cystic changes.  (*Id.*, PageID.873, 879).  In June 2019, an orthopedic surgeon opined that Johnson required a shoulder replacement for "end-stage right shoulder arthritis."  (*Id.*, PageID.876).

While the evidence shows that Johnson's right upper extremity conditions continued to worsen between the time of Dr. Gray's October 2017 review and the administrative determination, the ALJ supported his adoption of Dr. Gray's exertional and manipulative findings by stating that they were "consistent with the . . . clinical exams and not inconsistent with the . . . imaging findings." (*Id.*, PageID.51). It is unclear which imaging studies the ALJ is referring to giving that the imaging studies from May 2017 are consistent with rotator cuff tendinopathy with osteoarthritis. (*Id.*, PageID.578, 676). The ALJ's findings are directly contradicted by the more recent records showing that Johnson's shoulder pain was not responsive to over-the-counter medication, therapy, or injections, the imaging studies, and the recommendation for surgery.[5] (*Id.*, PageID.873, 879). Given that the shoulder problems culminated in a recommendation for surgery, the ALJ's finding that Johnson's "conservative level of treatment" discredited Drs. Hanna

---

[5] These records all pre-date the ALJ's decision. Although Johnson's condition post-dating the September 2019 administrative decision is not before the Court, later submitted records show that she underwent a total right shoulder replacement less than two months after the administrative decision. (*Id.*, PageID.63). If my recommendation is adopted for the reasons set forth here, the ALJ can consider the more recent evidence upon remand. *See Huber v. Comm'r of Soc. Sec.*, No. 07-14588, 2009 WL 111738, *11 (E.D. Mich. January 15, 2009) (claimant not barred from presenting new material upon remand for further proceedings on other grounds) (citing *Faucher v. Sec'y of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994)).

and Guyer's opinions that Johnson was incapable of the lifting and carrying requirements of light work is particularly questionable.  (*Id.*, PageID51).

A review of the VE's testimony also shows that the job findings supporting the Step Five finding are based on a slender reed.  The VE testified that while a limitation to occasional right-sided overhead reaching would allow for the work of a hand packager, cleaner/housekeeper, and tester, a preclusion on all right-sided overhead reaching (as supported by the imaging studies) would eliminate the job of cleaner/housekeeper.  (*Id.*, PageID.116).  As discussed above, the also VE testified that the other two jobs would be eliminated if vision problems prevented work involving near acuity.  (*Id.*, PageID.87).  The VE's testimony suggests that an even slightly more restricted RFC would preclude light work.

For these reasons, a remand is required for reconsideration of both the visual and manipulative limitations found in the RFC and consideration of whether the record supports an award of benefits for any 12-month period or more within the relevant period.  Notwithstanding that the non-disability determination does not accurately reflect the record, an award of benefits is premature.  A remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

IV.    Conclusion

For the reasons set forth above, it is RECOMMENDED that Johnson's

motion (ECF No. 16) be GRANTED and the matter REMANDED for further

proceedings, and that Commissioner's motion (ECF No. 17) be DENIED.

Dated:  January 19, 2022                    s/Kimberly G. Altman
Detroit, Michigan                           KIMBERLY G. ALTMAN
                                            United States Magistrate Judge

## **NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 19, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager